Eastern Casualty Insurance Company *v.* Commissioner of Insurance.

EASTERN CASUALTY INSURANCE COMPANY *vs.* COMMISSIONER OF INSURANCE & others.[1]

No. 05-P-387.

Suffolk. April 10, 2006. - November 2, 2006.

Present: PERRETTA, TRAINOR, & KATZMANN, JJ.

*Insurance,* Rating, Workers' compensation insurance, Commissioner of Insurance. *Administrative Law,* Judicial review. *Practice, Civil,* Review of decision of Commissioner of Insurance.

The Commissioner of Insurance did not err in affirming a penalty levied against an insurer by the Workers' Compensation Rating and Inspection Bureau (bureau) due to the poor paid-loss ratio earned by the insurer while servicing employers assigned to it by the bureau from a reinsurance pool comprised of employers unable to obtain workers' compensation insurance on the voluntary market, where the insurer failed to demonstrate that its poor paid-loss ratio was the consequence of the bureau's inequitable assignment of employers in the pool to servicing insurers. [681-684]

CIVIL ACTION commenced in the Superior Court Department on April 26, 2002.

The case was heard by *Geraldine S. Hines,* J., on a motion for judgment on the pleadings, and entry of separate and final judgment was ordered by *Christopher J. Muse,* J.

*Jerry E. Benezra* for the plaintiff.

*Scott P. Lewis (Jordana B. Glasgow & Donald C. Hillman* with him) for the interveners.

*Thomas A. Barnico,* Assistant Attorney General, for the defendant.

PERRETTA, J. This appeal by Eastern Casualty Insurance

[1] Workers' Compensation Rating and Inspection Bureau; The Travelers Casualty and Surety Company (formerly known as The Aetna Casualty and Surety Company); The Phoenix Insurance Company; The Hartford Accident and Indemnity Company; and United States Fidelity and Guaranty Company, interveners.

Company (Eastern) arises out of a penalty levied against it by the Workers' Compensation Rating and Inspection Bureau (the bureau) because of the poor paid-loss ratio Eastern earned while servicing employers assigned to it by the bureau from a reinsurance pool (the pool or reinsurance pool) comprised of employers unable to obtain workers' compensation insurance on the voluntary market. Eastern has consistently challenged the penalty, claiming that its poor paid-loss ratio was the consequence of the bureau's inequitable assignment of employers in the pool to servicing insurers. The penalty was upheld by the Division of Insurance (the division), and the division's determination was affirmed by the Commissioner of Insurance (the commissioner). Eastern then appealed to the Superior Court pursuant to G. L. c. 30A, § 14. On Eastern's motion for judgment on the pleadings, see Mass.R.Civ.P.12(c), as amended, 409 Mass. 1602 (1991), the judge concluded that Eastern had failed to establish that the commissioner's decision was unsupported by substantial evidence or based upon an error of law. We affirm the judgment.

1. *Background.* To put Eastern's argument in perspective, we set out the relevant statutory provisions, G. L. c. 152, §§ 65A(1)-(2) and 65C(1), and the undisputed evidence. Section 65A(1), as amended through St. 1991, c. 398, § 90, reads, in pertinent part:

> "Any employer whose application for workers' compensation insurance has been rejected or not accepted within five days by two insurers may appeal to the commissioner of insurance and if it shall appear that such employer has complied with or will comply substantially with all laws, orders, rules and regulations in force and effect relating to the welfare, health and safety of his employees, and shall not be in default of payment of any premium for such insurance, then the commissioner shall designate an insurer who shall forthwith, upon the receipt of the payment for the premium therefore, issue to such employer a policy of insurance contracting to pay the compensation provided for by this chapter. The commissioner of insurance shall make equitable distribution of [pool] risks among insurers in a reasonable manner that, so far as practicable, does not discriminate against any insurer or group of insurers."

The bureau is the rating organization designated by the commissioner pursuant to § 65A(2) to administer the reinsurance pool established under § 65C(1). As here relevant, § 65C(1), as amended through St. 1991, c. 399, § 2, provides:

> "All losses incurred under policies issued to employers under section sixty-five A shall be equitably distributed among all insurers authorized to transact and transacting workers' compensation insurance in the commonwealth. Such distribution of losses shall be effected through a re-insurance pool constituted by and comprised of all insurers writing workers' compensation insurance in the commonwealth."

Acting within the authority conferred upon it by the commissioner pursuant to § 65A(2),[2] the bureau implemented a mandatory nonrenewal program designed to reduce the number of employers seeking workers' compensation insurance from the reinsurance pool provided for by § 65C(1) by eliminating from the pool those employers capable of obtaining insurance in the voluntary market.[3] As implemented, the program randomly selected a portion of each servicing insurer's employers for mandatory nonrenewal. The servicing insurers were not notified in advance which employers would be selected for nonrenewal, and the nonrenewed employers were then required to apply for workers' compensation coverage in the voluntary insurance market. Employers still unable to obtain insurance in the voluntary market had to reapply to the pool and be reassigned to a servicing insurer within the pool.

In 1994, Eastern was the largest workers' compensation insurer in Massachusetts. As such, it was entitled to the largest share of employers insured through the pool, and it aggressively began to seek assignment of a larger number of employers. Because Eastern sought an increase in the number of assign-

---

[2] Section 65A(2), as amended through St. 1991, c. 398, § 90, mandates the bureau to "adopt rules and procedures for assigning rejected risks" and to "incorporate such rules and procedures into its plan of operation subject to the approval of the commissioner under section sixty-five C."

[3] As required by § 65A(1), each employer seeking to participate in the pool is required to establish that it had been refused workers' compensation insurance from two insurers on the voluntary market.

ments from the pool, the bureau adjusted the formula it used to assign employers in order to increase Eastern's "book" of business up to its maximum amount. The increase in Eastern's assignments coincided with the implementation of the bureau's mandatory nonrenewal program.[4] Eastern's new assignments during the years at issue in this dispute (1994-1995) came from the nonrenewal program.

Eastern was assessed a penalty on the basis of a poor servicing record for the years 1994 and 1995 as determined by a paid-loss ratio.[5] The bureau established this ratio for purposes of evaluating those insurers that serviced pool employers. Insurers having worse than average ratios, such as Eastern, were assessed a penalty, and insurers having better than average ratios received a bonus funded by the penalties.

2. *Discussion.* Eastern presented evidence at the division hearing to show that at the time the bureau made its adjustment of assignments to increase Eastern's share, each of the pool servicing insurers had a "book" of pool business that contained both inferior risks and risks that were capable of purchasing insurance in the voluntary market. More specifically, Eastern asserts that the evidence it presented to the division established that approximately one-third of each servicing insurer's business from the pool was capable of obtaining insurance in the voluntary market and that about one-third of the remaining employers in the pool were market quality risks retained by the servicing insurer without being subjected to the mandatory nonrenewal program. On the other hand, all of Eastern's assignments came through the mandatory nonrenewal program. It is on this basis that Eastern claims that the penalty levied against it was the result of the bureau's discriminatory and inequitable distribution of risks in violation of G. L. c. 152, §§ 65A(1) and 65C(1).

Although Eastern presented evidence to show that it sought to service employers from the pool based on its belief that there would be block transfers from other insurers of employers not

---

[4]Eastern was designated as a servicing carrier in the pool on May 1, 1994. The mandatory nonrenewal program was instituted effective July 1, 1994.

[5]A paid-loss ratio is the ratio of annual claims paid to annual premiums received.

subject to the nonrenewal program, there was contrary evidence to show that throughout the time that Eastern was pursuing a larger share of pool employers, the bureau's mandatory nonrenewal program was either imminent or already in place. There was also evidence that Eastern knew the program was imminent and that it knew that all the pool employers it was to be assigned would be from the program, that is, employers who had been refused insurance in the open market because they were inferior risks.

Eastern also presented expert witness testimony that Eastern's "book" of pool business came completely from the nonrenewal program whereas other servicing insurers retained risks that had not been randomly selected for review through the program. There was, however, nothing in the expert's testimony or any other evidence offered to refute the evidence that all employers in the pool were required to comply with the statutory criteria set out in § 65A(1), i.e., all employers had to have been rejected in the voluntary market. In short, the witness failed to articulate any deviation from, or disparity in, the commissioner's distribution of pool risks pursuant to § 65C(1).

To support its assertion that block transfers of employers from other insurers participating in the pool would have resulted in a nondiscriminatory and more equitable assignment of pool members to servicing insurers, Eastern put forth evidence to show that block transfers were eventually instituted in 1996. Although Eastern intimated that implementation of block transfers was the result of an antitrust audit of the bureau performed at the request of the division, Eastern offered nothing to show that the bureau was somehow required to institute block transfers nor evidence to support its intimation that such transfers were a response to the antitrust audit.

Evidence of alternative explanations for Eastern's poor paid-loss ratio was also presented. There was evidence to show that Eastern's claims handling procedures had notable deficiencies including late assignment of claims, late payment of bills, and late contact with employers and physicians. There was also evidence of overpayment to claimants. Based on all the evidence presented, the commissioner determined that the distribution of risks to Eastern was equitable and that the penalties were appropriately assessed.

In taking up Eastern's challenge to the judge's ruling on its motion for judgment on the pleadings, we apply the well-established standard of review stated in *Massachusetts Med. Soc.* v. *Commissioner of Ins.*, 402 Mass. 44, 62 (1988):

> "The duty of statutory interpretation is for the courts, *United States Jaycees* v. *Massachusetts Comm'n Against Discrimination*, 391 Mass. 594, 600 (1984), but an administrative agency's interpretation of a statute within its charge is accorded weight and deference. See *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 116 (1978). Where the Commissioner's statutory interpretation is reasonable, and his findings are supported by substantial evidence, the court should not supplant his judgment. *Insurance Rating Bd.* v. *Commissioner of Ins.*, 359 Mass. 111, 117 (1971)."

Relying upon the evidence before the division and the language of G. L. c. 152, § 65A, the judge accepted the commissioner's determination that the bureau had no obligation under § 65A to make block transfers. The testimony of Eastern's expert witness was no more than a statement that Eastern's "book" of pool business totally filtered through the mandatory nonrenewal program, whereas the "books" of other carriers servicing employers in the pool had retained risks that had not been randomly selected for review through the program. Standing alone, this testimony does not establish that Eastern's "book" of business was worse than that assigned to any other carrier servicing the pool. This is especially so in view of the fact that *all* employers in the reinsurance pool were required to meet the criteria set out in § 65A(1). Moreover, there is no evidence in the record to show that the bureau was required to institute block transfers or that it began block transfers in response to an antitrust audit.

Based on the materials before the judge and the plain language of the applicable statutes, we see no error in her conclusion that Eastern's evidence was insufficient to undermine the commissioner's determination that the distribution of risks assigned to Eastern was equitable and nondiscriminatory. The plain language of § 65A(1) does not require that all risks be distributed equally.

Rather, the statute requires only that the commissioner make "equitable distribution of [pool] risks among insurers in a reasonable manner that, *so far as practicable,* does not discriminate against any insurer or group of insurers" (emphasis added).

*Judgment affirmed.*